# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| JUSTIN SARDESON, | ) |
| Petitioner, | ) |
| vs. | ) Case No. 11-3368-CV-S-DGK-P |
| MICHAEL BOWERSOX, | ) |
| Respondent. | ) |

## OPINION AND ORDER DENYING PETITION FOR HABEAS CORPUS, AND DENYING THE ISSUANCE OF A CERTIFICATE OF APPEALABILITY

Petitioner, Justin Sardeson, filed this pro se habeas corpus petition pursuant to 28 U.S.C. § 2254 on September 16, 2011, seeking to challenge his 2006 conviction and sentence for second degree murder, which was entered in the Circuit Court of Dallas County, Missouri.

Petitioner raises three rounds for relief: (1) that trial counsel was ineffective in failing to present evidence of petitioner's diminished capacity; (2) that trial counsel was ineffective in failing to object to evidence of petitioner's prior bad acts against his victim; and (3) that counsel on direct appeal was ineffective in not appealing the trial court's decision to admit evidence of prior bad acts. Respondent contends that grounds 1 and 2 are procedurally defaulted, and that ground 3 is without merit.

## SUMMARY OF FACTS

On direct appeal, the Missouri Court of Appeals summarized the facts as follows:

> On August 4, 2001, [petitioner]'s girlfriend, Jennifer Crawford ("Jennifer"), gave birth to Victim. Jennifer and Victim lived with Jennifer's parents, Nikki and Larry Crawford ("Nikki" and "Larry"), for three weeks, before moving in with [petitioner]. [Petitioner] and Jennifer married on October 1, 2001, and a week later they moved back in with Jennifer's parents. Victim was taken to the hospital on

November 23 and December 16, 2001, for separate injuries. Due to suspected abuse, the Department of Social Services (the "Department") was contacted after the second trip to the hospital. After investigation, the Department determined that it was safe to return Victim to his family, and he was released from the hospital.

Without Jennifer or [petitioner]'s consent, Nikki and Larry decided that Victim should stay with Nikki's father and step-mother, James and Mary Cathey. Jennifer and [petitioner] did not know where Victim had been taken, and [petitioner] moved out of the Crawford's home the next day. Eventually, Jennifer found out where Victim was, and Victim was returned to his parents. On December 20, 2001, Jennifer and Victim moved in with [petitioner], who was then living with his mother, Betty Kammerer ("Kammerer").

On January 29, 2002, Larry picked up Jennifer and Victim at Kammerer's house, and he dropped Jennifer off for a class. While Jennifer was in class, Nikki and Larry took Victim to visit with other family members, and Victim appeared happy and playful. The Crawford's dropped Jennifer and Victim off at Kammerer's house around 9:15 p.m.

Around 2:00 a.m. the next morning, Jennifer called her parents crying and screaming and told them to come over because Victim was not breathing. At some point, [petitioner] had instructed Kammerer to call 911. When the paramedics arrived, [petitioner] was performing CPR on Victim in the living room. Jennifer's parents arrived later to find the paramedics attending to Victim, who was not breathing and did not have a pulse. While en route to the hospital, the paramedics were able to obtain a pulse for a brief period, but Victim was clinically dead when they arrived at the hospital, and the doctors were unable to revive him.

Officer Richard Neal ("Officer Neal") responded to the 911 call and was told by [petitioner] that he woke up and went to the bathroom, and as he was returning to bed, he noticed that Victim, who had been sleeping between himself and Jennifer, was not breathing. [Petitioner] told him that he woke up Jennifer, and they moved Victim into the living room, where he began performing CPR.

The autopsy performed on Victim revealed a recent abrasion to Victim's forehead, and several bruises around Victim's right eye, chin, forehead, shoulder blades, and hip area. The autopsy also revealed a skull fracture that was several weeks old.

Pathologist, Dr. James Shelley ("Dr. Shelley"), found a number of hemorrhages in Victim's thymus gland and lungs, indicating that Victim died of asphyxiation. Dr. Shelley also discovered two rib fractures, one occurring within twelve hours of Victim's death, as well as internal hemorrhaging beneath the connective tissue of the chest cavity.

The next day, Officer Rick Hamilton ("Officer Hamilton") with the Webster County Sheriff's Department contacted the State Technical Assistance Team ("STAT Team"), a state agency that is required by statute to investigate the death of all children under sixteen. STAT Team investigators, Officer Vernon Taylor ("Officer Taylor") and Officer Dan Stewart ("Officer Stewart"), traveled to Webster County to assist in the investigation of Victim's death. Carolyn Roth, n.3 with the Division of Family Services ("DFS"), arranged for the STAT Team to conduct interviews with members of Victim's family at the DFS office in Marshfield, Missouri.

> n.3 At the time, Ms. Roth was known as Carolyn Key.

Arrangements were made for [petitioner] to be interviewed on February 19, 2002. At that point, the STAT Team had already interviewed several other people regarding Victim's death. [Petitioner] was having car trouble the morning of the interview, so his step-father drove both [petitioner] and Jennifer to the DFS office. The interview was conducted in a conference room in an unsecured area of the office. [Petitioner] entered the conference room alone, where Officer Stewart, Officer Taylor, and Officer Hamilton were waiting to interview him. [Petitioner] was immediately told he was not under arrest and he was free to leave at any time. [Petitioner] was not restrained in any manner during questioning. Officer Stewart was not in uniform and was not carrying a firearm. n.4

> n.4 We cannot ascertain from the record whether this was true of Officer Taylor and Officer Hamilton.

[Petitioner] was first asked about Victim's prior injuries. While discussing the circumstances surrounding those injuries, Officer Hamilton became suspicious because [petitioner]'s answers were inconsistent with past investigations into those incidents. Officer Hamilton then employed the "third party" interrogation technique, telling [petitioner] that he had a family member involved in a similar situation, who had a person inside him that made him do things he normally would not do. Officer Hamilton suggested that [petitioner]

-3-

Case 6:11-cv-03368-DGK   Document 9   Filed 01/20/12   Page 3 of 13

might have a person inside him that caused him to do things that he normally would not do. Officer Hamilton also used the "assumption technique" telling [petitioner] that "you know I know what the truth is, don't you?" At that point, [petitioner] nodded "yes" and he started to cry. Officer Hamilton then asked [petitioner] to tell them what had happened.

[Petitioner] explained that the night Victim died, he was really angry at Nikki for taking Victim out into the cold, and as he lay in bed he got even angrier. [Petitioner] explained that "I rolled over, I put my elbow on the child's back and neck, I pushed and I pushed and I pushed, and I heard the baby wiggle and gasp." [Petitioner] said that he pushed harder when he felt Victim struggle underneath him. [Petitioner] explained that when he realized what he had done, he picked Victim up and started performing CPR. [Petitioner] said that he woke Jennifer up and yelled for Kammerer to call 911.

[Petitioner] was then asked again about Victim's prior injuries. [Petitioner] explained that one of Victim's injuries occurred when he hit Victim with a closed fist on the right side of his head, and that on another occasion he had "karate-chopped" Victim in the back of his head. [Petitioner] said that he had been angry with Jennifer and her parents, and he did not believe Victim was his child because he looked more like Jennifer's family. [Petitioner] said that sometimes he would get so mad that he just felt like killing something. [Petitioner] stated that he wanted to get everything out of his head, and every time he did something to Victim, he felt "like shit." [Petitioner] then said he felt like killing himself. At that point, Officer Hamilton and Officer Stewart went outside the room and decided to officially place [petitioner] in custody. When they returned to the conference room, they arrested [petitioner], advised him of his Miranda rights, and offered him a waiver form. At 12:05 p.m.,[petitioner] agreed to waive his rights and make a statement. He then repeated to the investigators what had happened the night Victim died.

[Petitioner] provided two written statements, the first of which read as follows:

> All I want is someone to help me. I don't want this man in me now [sic] more. I was real, real angry with Nikki, Jen's mom, taking [Victim] out in the cold and she kept calling me a bastard, and I just wanted her to stop going behind my back, say [sic] those things

about me. That night, I was so mad, so I took the anger out on [Victim]. I felt really bad for what I done, so I tried bringing him back. This was not me. I can't do this - - this any more. I am feeling real sorry for what I done. I just want help. I was laying there and I rolled over and laid on him so he could not breathe, and when he stopped, I picked him up and started to cry because I felt really bad about what I [sic] done. This was the night he passed away.

[Petitioner] provided a second written statement regarding the prior abuse of Victim, which read as follows:

I hit [Victim] in the head with the side of the [sic] my hand, and I also hit him with my fist one time. Then I felt real bad because [Nikki] made me very angry. Sometime[s] I can't control my anger and I would hit him, not meaning to. Sometime[s] I would burp him, I would use the hard part of my palm and use my fingers to help him burp. I bruised him one time. Jennifer sometimes would get angry and spank him because he would not go to sleep. He wanted to play, but not sleep. The handprint in the pictures are Jennifer's.

After providing the written statements, [petitioner] asked to speak to Jennifer so he could explain what happened. When Jennifer entered the conference room, [petitioner] told her, "I did it. I hurt [Victim]." [Petitioner] was then taken to jail, where he was allowed to make a phone call to Kammerer, which was recorded and introduced at trial. In relevant part, [petitioner]'s conversation with Kammerer was as follows:

[Petitioner]: It wasn't my fault, mom.

Kammerer: I know it wasn't your fault[.]

[Petitioner]: I just got mad.

Kammerer: What do you mean you just got mad? At [Victim]?

[Petitioner]: No, at Jennifer and her mom and dad, and I took it out on him.

-5-

> . . . .
>
> [Petitioner]: I didn't mean to hurt him - but I got mad.
>
> [Petitioner] was charged with first-degree murder. [Petitioner] has been tried and convicted twice of second-degree murder. We reversed [petitioner]'s first conviction in *State v. Sardeson*, 174 S.W.3d 598 (Mo. App. S.D. 2005). Following a jury trial, [petitioner] was again convicted of second-degree murder. [Petitioner] waived his right to jury sentencing, and the trial court sentenced him to thirty years imprisonment. This appeal followed.

State v. Sardeson, 220 S.W.3d 458, 461-64 (S.D. Mo. 2007).

Before the state court findings may be set aside, a federal court must conclude that the state court's findings of fact lack even fair support in the record. Marshall v. Lonberger, 459 U.S. 422, 432 (1983). Credibility determinations are left for the state court to decide. Graham v. Solem, 728 F.2d 1533, 1540 (8th Cir. en banc 1984). It is petitioner's burden to establish by clear and convincing evidence that the state court findings are erroneous. 28 U.S.C. § 2254 (e)(1).[1] Because the state court's findings of fact have fair support in the record and because petitioner has failed to establish by clear and convincing evidence that the state court findings are erroneous, the Court defers to and adopts those factual conclusions.

## **GROUNDS 1 & 2**

In his first ground for relief, petitioner contends that trial counsel was ineffective in failing to present evidence of petitioner's diminished capacity. Specifically, petitioner contends that "pre-trial psychological and neurological evaluations established mental diseases [or] defects which

---

[1]"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

-6-

would diminish petitioner's capacity to know or be aware that his conduct was practically certain to cause the death of [the victim]." (Doc. No. 1, pg. 5). In his second ground for relief, petitioner contends that trial counsel was ineffective in failing to object to evidence of petitioner's prior acts of abuse against his victim. Specifically, trial counsel did not object to the testimony of the victim's great-grandmother, who testified that "she saw a bump on [the victim's] head. She confronted petitioner who told her the baby had fallen off the couch . . . [and] she called [petitioner] a liar." (Doc. No. 1, pp. 6-7).

Respondent correctly maintains that grounds 1 and 2 are procedurally defaulted. In Coleman v. Thompson, 501 U.S. 722 (1991), the Supreme Court held:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

Id. at 750. Cause, actual prejudice, and the probability of a "fundamental miscarriage of justice" are to be judged under criteria set out in Wainwright v. Sykes, 433 U.S. 72 (1977), and Murray v. Carrier, 477 U.S. 478 (1986). Coleman, 501 U.S. at 748-50.

A review of the record reveals that petitioner defaulted grounds 1 and 2 by not raising them on appeal from the denial of his Mo. Sup. Ct. Rule 29.15 motion. His brief on collateral appeal raised a claim of ineffective assistance of direct appeal counsel, not trial counsel. (See Respondent's Exhibit I).

Grounds 1 and 2 may not be reviewed by this Court unless petitioner can demonstrate cause and actual prejudice, or that failure to consider his claims will result in a fundamental miscarriage

of justice. Coleman v. Thompson, 501 U.S. 722, 750 (1991). This Court will not reach the "prejudice" component of the analysis unless it first finds that the petitioner has demonstrated "cause" for his procedural default.

Petitioner fails to show cause for his procedural default. In his Reply, he points to the failure of appellate counsel to raise grounds 1 and 2 on post-conviction appeal. (See Petitioner's Reply, Doc. No. 8, pg. 1). However, the Eighth Circuit has explicitly stated that alleged ineffective assistance of post-conviction relief counsel in not raising all of petitioner's desired claims cannot excuse procedural default. Armstrong v. Iowa, 418 F.3d 924, 927 (8th Cir. 2005).

Even though petitioner has failed to demonstrate cause (and, therefore, we do not consider prejudice) for his procedural default, the Court can still reach the merits of his claims if he can show that he is "probably actually innocent" of the crimes for which he was convicted. Bowman v. Gammon, 85 F.3d 1339, 1346 (8th Cir. 1996), cert. denied, 520 U.S. 1128 (1997). To demonstrate his innocence, petitioner must satisfy a two-part test: First, he must support his allegations of constitutional error "with new reliable evidence. . . that was not presented at trial." Second, he must establish "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id., citing Schlup v. Delo, 513 U.S. 298 (1995). However, petitioner does not make this showing.

Petitioner has failed to show cause for his default of Grounds 1 and 2. He does not show that a manifest injustice will occur if these grounds are not reviewed on the merits, and he has failed to meet the Schlup standard for actual innocence. Id. Therefore, federal review of grounds 1 and 2 is barred.

Grounds 1 and 2 are denied.

## GROUND 3

In ground 3, petitioner contends that direct appeal counsel was ineffective in failing to brief and argue the trial court's error in admitting evidence of prior abuse of the victim. Respondent contends this ground is without merit.

Federal habeas review of petitioner's ineffective assistance of counsel claim is "doubly deferential." Knowles v. Mirzayance, 556 U.S. 111, 129 S. Ct. 1411, 1420 (2009). First, petitioner must overcome the high bar of Strickland v. Washington, 466 U.S. 668 (1984), by showing that (1) counsel's performance fell below an objective standard of reasonableness; and (2) petitioner was sufficiently prejudiced such that "the result of the proceeding would have been different." Id. at 688, 694. Second, under 28 U.S.C. § 2254, petitioner must show that the state court's adjudication of his ineffective assistance claim was "unreasonable." Harrington v. Richter, ___ U.S. ___, 131 S. Ct. 770, 788 (2011). Both the Strickland standard and the standard set forth in § 2254 are highly deferential. Ultimately, "[t]he question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 131 S. Ct. at 788.

On appeal from the denial of petitioner's Mo. Sup. Ct. Rule 29.15 motion, the Missouri Court of Appeals disposed of petitioner's claim as follows:

> In [petitioner]'s point, he contends the motion court clearly erred by denying post-conviction relief because his appellate counsel was ineffective for failing to raise a claim on appeal challenging the admission of evidence of his past abusive acts against Victim. The following facts are necessary to discuss the point.
>
> Prior to [petitioner]'s second trial, his trial counsel filed a motion in limine requesting the court to, *inter alia*, preclude the State from introducing evidence that [petitioner] had "committed any prior acts of physical or other abuse" to Victim, and that Victim had sustained any injuries prior to his death. The court denied these requests. n.2

> n.2 Hand-written notes on [petitioner]'s motion indicate that as to both requests, each was "denied as to intent."

Victim was born on August 4, 2001. Approximately five months later, on January 30, 2002, Victim died in an ambulance on the way to the hospital. Over defense counsel's continuing objections as prior bad acts, the State adduced evidence of two other occasions when Victim was taken to the hospital emergency room (ER). On November 23, 2001, the treating ER doctor diagnosed Victim with a head contusion, based on a large knot at the base of Victim's skull on the back of his head. At that time, [petitioner] explained that Victim rolled off the couch when [petitioner] went upstairs to get some baby wipes. On December 16, 2001, Victim was again taken to the ER, this time for handprint-shaped bruises on his bottom and lower back. In addition to bruising, a CT-scan of Victim's head confirmed several linear fractures in the right back side of the skull. Fractures such as those Victim suffered are not very common in infants because it takes a significant amount of force to cause those types of fractures. Victim was treated this second time by the same ER doctor, who suspected possible abuse and contacted the Children's Division (Division). A Division worker later released Victim into the custody of grandparents, who eventually returned Victim to his mother's and [petitioner]'s care.

The pathologist performing Victim's autopsy determined the cause of his death was asphyxiation, consistent with suffocation. At trial, [petitioner]'s defense was that Victim died of "accidental asphyxiation" while he was sleeping between his mother and [petitioner].

The autopsy revealed recent abrasions and bruising, as well as the skull fracture that was several weeks old. The autopsy also revealed two rib fractures near the spinal cord, one several weeks old and one that occurred within 12 hours before Victim's death. The pathologist indicated that a rib fracture in a child of Victim's age would require a significant amount of force to inflict because infant bones are very pliable. The pathologist also indicated that he did not believe Victim's death was due to SIDS or accidental roll-over, due to his broken ribs, bruising, abrasions and skull fracture.

[Petitioner] raised the claim of erroneous admission of prior abuse in his motion for new trial. In [direct appeal counsel]'s affidavit, she acknowledged that the claim had been preserved, but she nevertheless

reached the legal conclusion that the claim had no merit. [Direct appeal counsel] specifically stated she believed that "in this case it was relevant to the defendant's intent." The motion court agreed and concluded [direct appeal counsel] did not provide ineffective assistance for failing to raise a meritless claim on appeal.

[Petitioner] maintains the motion court clearly erred in reaching that conclusion. [Petitioner] specifically points to the evidence of Victim's prior injuries adduced from the November 23 and December 16, 2001 visits to the ER and argues such evidence was inadmissible because the evidence was offered only to show that he "was of such poor character that he would abuse his son," and therefore had the propensity to commit the crime charged. We disagree.

[Petitioner] is correct that he has the right to be tried only for the offense for which he is on trial, and that evidence of other crimes committed by him is normally inadmissible. ***State v. Edwards***, 116 S.W.3d 511, 533 (Mo. banc 2003). "But, evidence of other crimes is admissible for certain purposes, such as to show motive, intent, lack of accident or mistake, or common scheme or plan." ***Id.***; *see* ***State v. Haslett***, 283 s.W.3d 769, 781 (Mo. App. 2009). Evidence of prior mistreatment of the child may be considered in establishing the intent required for the child's murder. ***Haslett***, 283 S.W.3d at 781. Such evidence may be admissible to show a defendant's intent in harming the child, motive, i.e., *aminus* [sic] directed toward the child, and the absence of mistake or accident. ***Id.*** (evidence was admissible to show defendant's intent and motive to purposely injured child and that the child's injuries were not the result of an accident in that defendant had attempted to injure child on previous occasions). n.3

> n.3 Numerous cases have held that evidence of a defendant's prior abuse of the child is admissible to show intent, motive and absence of mistake or accident. . . .

Here, the evidence of Victim's prior injuries and abuse was admissible to show [petitioner]'s intent, motive and absence of mistake or accident, *particularly because [petitioner]'s defense was that Victim's death was accidental*. *See* ***Haslett***, 283 S.W.3d at 782. As the evidence was properly admitted, "appellate counsel was not ineffective in failing to raise the issue on appeal." ***Glover v. State***, 225 S.W.3d 425, 429 (Mo. banc 2007). "Failing to raise a nonmeritorious claim does not convict counsel of being ineffective." ***Id.*** n.4

-11-

> > n.4 In addition, [petitioner] failed to establish prejudice. . . .
>
> After reviewing the entire record, we do not have a definite and firm impression that a mistake was made. . . .

(Respondent's Exhibit K, pp. 4-8) (emphasis added).

The resolution of ground 3 by the state court did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000).[2]

Ground 3 is denied, and the case will be dismissed, with prejudice.

## **CERTIFICATE OF APPEALABILITY**

Under 28 U.S.C. § 2253(c), the Court may issue a certificate of appealability only "where a petitioner has made a substantial showing of the denial of a constitutional right." To satisfy this standard, a petitioner must show that a "reasonable jurist" would find the district court ruling on the constitutional claim(s) "debatable or wrong." <u>Tennard v. Dretke</u>, 542 U.S. 274, 276 (2004). Because petitioner has not met this standard, a certificate of appealability will be denied. <u>See</u> 28 U.S.C. § 2254, Rule 11(a).

---

[2]According to the concurrence of Justice O'Connor, joined by four other members of the Court, "under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413, 120 S.Ct. at 1523.

## **ORDER**

Accordingly, it is **ORDERED** that:

(1) the above-captioned petition for writ of habeas corpus is denied;

(2) this case is dismissed with prejudice; and

(3) the issuance of a certificate of appealability is denied.

        /s/ Greg Kays
        GREG KAYS
        UNITED STATES DISTRICT JUDGE

Kansas City, Missouri,

Dated:  January 20, 2012.